# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. David Boggs | ) |
| 2. Sue Boggs, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. 08-CV-660-CVE-PJC |
| | ) |
| 1. Great Northern Insurance Company, | ) |
| 2. Federal Insurance Company, | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Plaintiffs, David and Sue Boggs, respectfully submit this Response to the Motion for Summary Judgment filed by the Defendants (Document 18). As is fully explained below and in the Plaintiffs' contemporaneously filed Brief in Support of Motion for Summary Judgment, the Defendants provide liability coverage to the Plaintiffs.

## INTRODUCTORY STATEMENT

This case arises out of the Defendant liability insurers' incorrect denial of liability coverage to the Boggses. Defendant Great Northern Insurance Company (Great Northern) was the Boggses' homeowners insurer. Defendant Federal Insurance Company (Federal) was the Boggses' personal umbrella liability insurer.

Both of the Defendants are members of the Chubb Insurance Group. (Chubb Web Page Excerpt, "Chubb Subsidiaries," Exhibit "1"). The Chubb group of companies services people with valuable homes who are willing to pay for better than average coverage. For example, Chubb's web page boasts that it provides homeowners coverage for "distinctive or customized homes and their

owners, with more choices and features not usually found in other policies." (Chubb Homepage Excerpt, Exhibit "2"). Chubb also boasts that its homeowners policies are "designed exclusively for people with above-average needs, who need more than conventional insurance." (Id.) Chubb's boasts are not puffery -- its policies provide broader coverage than typical personal insurance policies.

Unfortunately, Chubb now wants to pretend that the Boggses Cadillac policy is really a Chevy. The Boggses sought liability coverage from the Defendant insurers due to claims that were asserted by Kenneth W. Williams, II and Cynie E. Williams. The Boggses sold a house to the Williamses. The house was a large structure with six fireplaces. Prior to selling the house to the Williamses, the Boggses used four of the fireplaces without any difficulties, but they had not bothered to install gas logs in the other two fireplaces. Prior to the sale, the Boggses represented to the Williams that the house's fireplaces were in good working order, which the Boggses believed was true.

After closing, the Williamses hired a contractor who informed them that the fireplace chimneys were defective and that all of the house's chimneys needed to be completely replaced, at a cost of over $400,000.00. The proposed repairs were extensive and would have involved demolition of large portions of the house, which necessarily would have entailed loss of use of much of the house. The Williamses sued the Boggses, alleging that the Boggses had made intentional and negligent misrepresentations about the fireplaces and that the Boggses had completed negligent repairs to the fireplaces prior to the sale.

Unfortunately, the Defendants refused to honor the terms of the Boggses' policies. Despite a promise to defend "groundless, false or fraudulent" claims, the Defendants would not even provide

the Boggses with a defense. The Boggses were required to pay $45,551.25 of their own money for a defense. They then decided to settle the Williamses' claims for $37,000.00, in light of the "economics" of proceeding to trial. The Boggses filed this lawsuit to recover what they were rightfully owed all along from their insurers.

The Defendants have filed a Motion for Summary Judgment, urging this Court to find that the policies provided no coverage. As will be explained, the Defendants' arguments ignore the actual facts of the Williamses' claims and largely ignore the terms of the Boggses' insurance policies.

## STATEMENT OF ADDITIONAL, MATERIAL UNDISPUTED FACTS

In response to the Defendants' Statement of Undisputed Facts, the Boggses set forth the following additional material facts that, for purposes of this Motion, are not in dispute and preclude the entry of summary judgment in favor of the Defendants:

### The Boggses' Construction And Sale Of The House

1.  In 1995, the Boggses had a house built at 5009 East 117th Street, Tulsa, Oklahoma ("the House"). The House had six fireplaces, and the Boggses had gas logs installed in the fireplaces in the master bedroom, the family room, the formal living room and the basement. (Sue Boggs Deposition, Exhibit "3", pp. 7, 14, 19; Photos of the House, collectively provided as Exhibit "4").

2.  In 1995, the Boggses also had a problem with the fireplace in the House's master bedroom, which developed soot around the edge of the fireplace. (Sue Boggs Deposition, Exhibit "3", p. 24). The Boggses promptly hired a contractor who made some repairs to the fireplace that eliminated the sooting problem. (Id., pp. 24-25). While the Boggses owned the house, they used the fireplace that was located in the House's master bedroom without incident and assumed that the fireplace did not have any problems. (Defendant Sue Boggs' Answer to Interrogatory No. 9 from

3

Tulsa County Case No. CJ-2004-1655, Exhibit "5").

3. By December of 1996, the Boggses realized that the fireplace in the House's basement was not drawing exhaust properly. (Sue Boggs Deposition, Exhibit "3", p. 19). The Boggses then contacted a contractor, who made changes to the fireplace and installed a new gas log set, which appeared to the Boggses to have corrected the problem. (Id., pp. 20-21, 23).

4. After the repairs to the fireplaces, the Boggses installed carbon monoxide detectors, which never indicated that carbon monoxide was present while the fireplaces were in use, and the Boggses believed that the fireplaces were drawing exhaust properly. (Id., Exhibit "3", pp. 34-35, 39-40).

5. On April 21, 2003, the Boggses entered into a contract to sell the House to Kenneth W. Williams, II and Cynie E. Williams. (Contract of Sale of Real Estate, Exhibit "5-A"). When the Boggses filled out a Residential Disclosure Form in connection with the sale of the House to the Williamses, they indicated that the fireplaces were in good working order. (Sue Boggs Deposition, Exhibit "3", pp. 49-50). The information the Boggses provided to the Williamses was consistent with their belief that the fireplaces in the House either were in working order or that gas fireplaces that would function properly could be installed in them. (Id., pp. 49-50).

6. In the fall of 2005, the Williamses purchased two new gas log sets to put in the two fireplaces that the Boggses had not used and which remained empty. (Cynie Williams Deposition, Exhibit "6", pp. 42-43; Kenneth W. Williams Response to Interrogatory No. 9 from Case No. CJ-2004-1655, Exhibit "7"). However, the installer told Ms. Williams that there was a pre-existing problem with the fireplaces that caused them not to draw exhaust correctly and advised them that they could not use the fireplaces due to the threat of the build-up of carbon monoxide and fumes in

4

the house. (Cynie Williams Deposition, Exhibit "6", pp. 42-43).

7. On or about February 22, 2004, the Williamses obtained a quote from the same company for repairs of the alleged defects in the fireplaces. (February 22, 2004 Kleinco Customer Quotation, Exhibit "8"). The contractor proposed totally demolishing and replacing six chimneys at a cost of $419,800.00. (Id.). The contractor who prepared the estimate recognized that the proposed repairs would have been "very invasive to the house." (Kenneth Klein Deposition, Exhibit "9", p. 32).

### The Williamses' False And Fraudulent Allegations Against The Boggses And The Defendants' Incorrect Coverage Denials

8. On March 10, 2004, the Williamses sued the Boggses in the District Court for Tulsa County, Oklahoma. (Petition for Case No. CJ-2004-1655, Exhibit "10"). The Williamses asserted a claim pursuant to 60 O.S. § 835 and common law actual fraud, all based upon the alleged failure to disclose known defects with the fireplaces in the house. (Id., pp. 1-2). They sought to recover over $419,000.00 in actual damages. (Id.). They sought unspecified actual damages in addition to the repair costs. (Id., pp. 2-3).

9. On May 18, 2004, the Boggses provided notice to Chubb of the suit and requested that they be provided with a defense. (May 18, 2004 letter from Mark Smiling to Joey Dilles, Exhibit "11").

10. On July 29, 2004, the Defendants denied coverage to the Boggses, including denying a defense, for the claims asserted in the Williamses' lawsuit. (July 29, 2004 letter from George Adkins to Mark Smiling, Exhibit "12"). Ignoring the fact that the Williamses' Petition reserved the right to recover damages in excess of the repair costs, the Defendants' denial letter asserted –

incorrectly – that the Williamses' alleged damages were limited to "actual damages to repair the fireplaces and exemplary damages of $838,000.00." (Id., p. 1).

11. On April 5, 2005, the Boggses' attorney advised the Defendants that discovery completed in the case demonstrated that the Boggses did not make any intentional misrepresentations to the Williamses in connection with the sale of the House.(April 5, 2005 letter from Mark Smiling to George Adkins, Exhibit "13"). The Boggses' counsel again requested that the Defendants assume the Boggses' defense. (Id.).

12. On June 24, 2005, the Defendants again denied a defense to the Boggses. (June 24, 2005 letter from George Adkins to Mark Smiling, Exhibit "14"). The Defendants again asserted – again incorrectly – that the Boggses' claims for actual damages were limited to the repair costs to replace the fireplaces and related exemplary damages. (Id., p. 1)

13. On September 6, 2005, Plaintiff Kenneth Williams filed an Amended Petition against the Boggses. (Amended Petition from Tulsa County Case No. CJ-2004-1655, Exhibit "15"). Mr. Williams alleged that the fireplaces in the subject house "were constructed with flues of reduced size that allowed the emission of carbon monoxide into rooms of the subject residence." (Id., p. 2). The Amended Petition asserted claims for actual fraud, negligent misrepresentation and negligently failing to repair the fireplaces to comply with the building code. (Id.). The Amended Petition again alleged that the cost of repairing the fireplaces was $419,000.00. (Id., pp. 2-3). However, Mr. Williams again sought actual damages exceeding those repair costs. (Id., pp. 2-4).

14. From the Williamses' filing of the original Petition to their filing of the Amended Petition, the Boggses incurred attorney fees in the amount of $28,772.50. (Affidavit of Mark Smiling, Exhibit "16").

15. On September 15, 2005, the Boggses provided the Amended Petition to Chubb, and again requested coverage. (September 15, 2005 letter from Mark Smiling to George Adkins, Exhibit "17").

16. On September 16, 2005, the Boggses filed an Answer to the Amended Petition in which they denied liability and asserted that the Williamses' claims did not have a factual basis. (Answer of Defendants David Boggses and Sue Boggses to Plaintiff's Amended Petition filed September 16, 2005, Exhibit "18").

17. On September 26, 2005, the Defendants again denied coverage to the Boggses, both for defense and indemnity. (September 26, 2005, letter from George Adkins to Mark Smiling, Exhibit "19"). The Defendants asserted that the denial of coverage was "premised upon allegations set forth in the Amended Petition[1] and the terms and conditions of the policy." (Id.).

18. On November 30, 2006, the Boggses notified the Defendants that they had received a demand from the Williamses for settlement of the claim for $37,000.00 and requested that Chubb provide indemnification in that amount to settle the claim. (November 30, 2006 letter from Mark Smiling to George Adkins, Exhibit "20").

19. On December 14, 2006, Chubb notified the Boggses that it would not participate in a proposed settlement. (December 14, 2006 letter from George Adkins to Mark Smiling, Exhibit "21").

20. On December 18, 2006, the Boggses entered into an agreement to settle the Williams' claims by paying $37,000.00 for a release, and that settlement was consummated soon thereafter.

---

[1] As will be discussed below, under Oklahoma law, a liability insurer cannot evaluate its duty to defend an insured by review of the allegations in a petition. Instead, the insurer must also determine the duty to defend by reviewing the actual facts.

(Affidavit of Mark Smiling, Exhibit "16", ¶ 5 ). The Boggses' counsel, Mark Smiling, concluded that the settlement was reasonable due to the potential exposure in the case and the costs to litigate the case through trial. (Id.).

21. The Boggses paid their personal attorneys an additional $16,778.75 to defend the Williamses' claims after the filing of the Amended Petition and through the entry into the settlement. (Id., ¶ 6). In total, the Boggses paid attorney fees totaling $45,551.25 relating to the defense of the Williamses' claims. (Id.).

## The Boggses' Insurance Policies And Their Terms

22. At all relevant times, the Boggses were the named insured for a homeowners policy issued by Defendant Great Northern. (See generally, Great Northern Policy, Exhibit "22"). The Great Northern homeowners policy provided liability coverage with a $1,000,000.00 liability limit. (Id., p. 7). The Great Northern homeowners policy also contained the following terms:

**Definitions**

In this policy, we use words in their plain English meaning. Words with special meanings are defined in the part of the policy where they are used. The few defined terms used throughout the policy are defined here:

**You** means the person named in the Coverage Summary, and a spouse who lives with that person. . . .

**Occurrence** means a loss or accident to which this insurance applies occurring within the policy period. Continuous or repeated exposure to substantially the same general conditions unless excluded is considered to be one occurrence. . . .

**Personal Liabil**ity Coverage

We cover damages a covered person is legally obligated to pay for personal injury or property damage which take place anytime during the policy period and are caused by an occurrence, unless stated otherwise or an exclusion applies. Exclusions to this coverage are described in **Exclusions**.

8

A "covered person" means:

- you or a family member

- any other person or organization with respect to liability because of acts or omissions of you or a family member; or

- any combination of the above.

"Damages" means the sum that is paid or is payable to satisfy a claim settled by us or resolved by judicial procedure or by a compromise we agree to in writing. . . .

"Property damage" means physical injury to or destruction of tangible property, including the loss of its use. Tangible property includes the cost of recreating or replacing stocks, bonds, deeds, mortgages, bank deposits, and similar instruments, but does not include the value represented by such instruments. . . .

**Defense coverages**

We will defend a covered person against any suit seeking covered damages for personal injury or property damage. We provide this defense at our own expense, with counsel of our choice, even if the suit is groundless, false, or fraudulent. We may investigate, negotiate, and settle any such claim or suit at our discretion. . . .

**Exclusions**

These exclusions apply to your Personal Liability Coverage, including the Extra Coverages, unless stated otherwise. . . .

**Damage to covered person's property.** We do not cover any person for property damage to property owned by any covered person. . . .

**Intentional acts.** We do not cover any damages arising out of an act intended by any covered person to cause personal injury or property damage, even if the injury or damage is of a different degree or type than actually intended or expected. An intentional act is one whose consequences could have been foreseen by a reasonable person. But we do cover such damages if the act was intended to protect people or property unless another exclusion applies. . . .

(Id., pp. 26-27, 30-31).

23. At all relevant times, the Boggses were also the named insured for an umbrella

liability policy that was issued by Defendant Federal Insurance Company, which provided excess liability insurance coverage subject to a $1 million liability limit. (<u>See</u> <u>generally</u> Federal Umbrella Policy, Exhibit "23"). The umbrella policy contained the following terms:

> **Definitions**
>
> In this policy, we use words in their plain English meaning. Words with special meanings are defined in the part of the policy where they are used. The few defined terms used throughout the policy are defined here:
>
> **You** means the person named in the Coverage Summary, and a spouse who lives with that person.
>
> **We** and **us** mean the insurance company named in the Coverage Summary. . . .
>
> **Occurrence** means a loss or accident to which this insurance applies occurring within the policy period. continuous or repeated exposure to substantially the same general conditions unless excluded is considered to be one occurrence.
>
> This part of your Masterpiece Policy provides you with liability coverage in excess of your underlying insurance anywhere in the world unless stated otherwise or an exclusion applies. . . .
>
> **Excess Liability Coverage**
>
> We cover damages a covered person is legally obligated to pay for personal injury or property damage, caused by an occurrence:
>
> ●in excess of damages covered by the underlying insurance; or
>
> ●from the first dollar of damage where no underlying insurance is required under this policy and no underlying insurance exists; or
>
> ●from the first dollar of damages where underlying insurance is required under this policy but no coverage is provided by the underlying insurance for a particular occurrence, unless stated otherwise or an exclusion applies.
>
> Exclusions to this coverage are described in **Exclusions**.
>
> "Follow form" means:

We cover damages to the extent that they are both covered under the Required Primary Underlying Insurance and, not excluded under this part of your Masterpiece Policy. Also, the amount of coverage, defense coverages, cancellation and "other insurance" provisions of this policy supersede and replace the similar provisions contained in such other policies. When this part of your policy is called upon to pay losses in excess of required primary underlying policies exhausted by payment of claims, we do not provide broader coverage than provided by such policies. When no primary underlying coverage exists, the extent of coverage provided on a follow form basis will be determined as if the required primary underlying insurance had been purchased from us.

A "covered person" means:

● you or a family member . . .

"Damages" means the sum that is paid or is payable to satisfy a claim settled by us or resolved by judicial procedure or by a compromise we agree to in writing. . . .

"Property damage" means physical injury to or destruction of tangible property and the resulting loss of its use. Tangible property includes the cost of recreating or replacing stocks, bonds, deeds, mortgages, bank deposits, and similar instruments, but does not include the value represented by such instruments. . . .

**Defense coverages**

We will defend a covered person against any suit seeking covered damages for personal injury or property damage that is either:

● not covered by any underlying insurance; or

● covered by an underlying policy as each Defense Coverage has been exhausted by payment of claims.

We provide this defense at our expense, with counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate, negotiate, and settle any such claim or suit at our discretion. . . .

**Exclusions**

These exclusions apply to your Excess Liability Coverage, unless stated otherwise. . . .

**Damage to covered person's property**. We do not cover any person for property

damage to property owned by any covered person. . . .

**Intentional acts**. We do not cover any damages arising out of an act intended by any covered person to cause personal injury or property damage, even if the injury or damage is of a different degree or type than actually intended or expected. An intentional act is one whose consequences could have been foreseen by a reasonable person. But we do cover such damages if the act was intended to protect people or property unless another exclusion applies. . . .

(Id., pp. 6, 9-14).

## **RESPONSE TO THE DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

For further response to the "Statement of Undisputed Facts" set forth in the Defendants' summary judgment brief, the Boggses do not dispute those statements except to the extent stated below. However, the Boggses object to the accuracy, the immateriality or incompleteness of the Defendants' factual statements as follows:

1. The Defendants' Fact Nos. 1 through 3 and 12 all relate to allegations contained in the Williamses' Amended Complaint. Although the allegations contained in that pleading are relevant to coverage, those allegations: (a) are not dispositive; and (b) standing alone, do not provide a basis for a finding that the Defendants provide no liability coverage to the Boggses. Instead, as will be explained, Oklahoma law requires liability insurers to evaluate the duty to defend based on the actual facts, not merely based upon the claimants' allegations against the Boggses.

2. The Defendants' Fact No. 2 does not set forth all of the relevant "events which led to the Boggses' sale of the house to the Williamses." (See the Boggses' Undisputed Fact Paragraph Nos. 1 through 5, supra and evidence cited at those paragraphs).

2. The Defendants' Fact Nos. 7 through 11 and 13 correctly state that the Boggses insurance policies contain various types of provisions. However, the Defendant's factual statements

12

are materially incomplete in that they have failed to actually set forth the relevant terms of the policies. (See the Boggses' Undisputed Fact Paragraph Nos. 22 and 23, supra and evidence cited at those paragraphs). As will be explained below, the Defendants fail to recognize the effects of particular policy terms on their obligations to provide coverage to the Boggses.

3. The Defendants' Fact No. 12 asserts that the allegations in the Underlying Action were that the fireplaces were constructed improperly. While that is true, it is not a complete summary of the relevant allegations that the Williamses made against the Boggses. (See the Boggses' Undisputed Fact Paragraph Nos. 8 through 20, supra, and evidence cited at those paragraphs). Also, Oklahoma law requires insurers to evaluate the duty to defend based on the actual facts, not merely based upon a claimants' allegations.

## ARGUMENTS AND AUTHORITIES

In lieu of repeating the exact arguments twice, and due to page limitations, the Bogges hereby adopt and incorporate the Arguments and Authorities set forth at pages 8 through 25 of their contemporaneously filed Brief In Support of The Plaintiffs' Motion for Partial Summary Judgment as if fully set forth in this Brief.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment should be denied. The specific terms of the Boggses' policies, under the facts presented, protected the Boggses from the Williamses' groundless suit.

Respectfully submitted,

SMILING, MILLER & VAUGHN


By  s/J. Anthony Miller
  A. Mark Smiling - OBA #10672
  J. Anthony Miller - OBA #10404
  9175 South Yale, Suite 150
  Tulsa, OK  74137-4044
  (918) 477-7500


## CERTIFICATE OF MAILING

I, J. ANTHONY MILLER, hereby certify that on the 15th day of June, 2009, I mailed a true and correct copy of the above and foregoing instrument with proper postage thereon fully prepaid to:

Kerry R. Lewis
Mr. John Tucker
Rhodes, Hieronymus
100 West 5th Street, Suite 400
Tulsa, OK  74103-4287


  s/J. Anthony Miller
  J. ANTHONY MILLER