IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. David Boggs<br>2. Sue Boggs,<br><br>    Plaintiffs,<br><br>vs.<br><br>1. Great Northern Insurance Company,<br>2. Federal Insurance Company,<br><br>    Defendants. | Case No. 08-CV-660-CVE-PJC |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR
MOTION FOR PARTIAL SUMMARY JUDGMENT**

The Plaintiffs, David and Sue Boggs, respectfully submit this Reply Brief in support of their previously filed Motion for Partial Summary Judgment.

**ARGUMENTS AND AUTHORITIES**

**A. The Facts Presented In The Boggses' Summary Judgment Brief Are Material And Undisputed.**

The Defendants have made no effort whatsoever to dispute the facts with any evidence. Instead, they contend that the actual facts of the Williamses' lawsuit are "immaterial." As has been explained, Oklahoma law requires this Court and the Defendants to review the actual facts of that lawsuit. See First Bank of Turley v. Fidelity & Deposit Ins. Co. of Maryland, 1996 OK 105, 928 P.2d 289, 303-04. This Court cannot evaluate the defense issues solely by referencing the Williamses' groundless allegations.

The evidence cited in the Boggses' opening Brief is all directly relevant to the Defendants' stated grounds for denying coverage. The Boggses' undisputed evidence, for example, establishes that the Boggses had no actual knowledge that the House's chimneys were

defective, and thus, they could not have been liable for intentional fraud. Moreover, the evidence demonstrates that the Williamses explicitly claimed damages *in addition to* repair costs. The Williamses claimed that they needed to make "very invasive" repairs that involved demolishing much of the house, which necessarily would have caused a substantial physical injury to and loss of use of the house and chimneys.

B. **The Defendants Applied An "Eight Corners" Rule For Evaluating The Duty To Defend.**

At page two of their Response Brief, the Defendants deny using an "Eight Corrners" approach when evaluating the duty to defend. However, the Defendants have not provided any evidence to support this assertion. Before the Defendants denied coverage, they did no investigation of the actual facts. When George Adkins denied coverage to the Boggses, he stated -- repeatedly -- that the Defendants' coverage denial was "premised upon allegations set forth in the Amended Petition and the terms and conditions of the policy." (September 26, 2005, letter from George Adkins to Mark Smiling, Plaintiffs' Exhibit "19"; December 14, 2006, letter from George Adkins to Mark Smiling, Plaintiffs' Exhibit "21"). Mr. Adkins also emphatically (and incorrectly) proclaimed that the Defendants owed no coverage because **"[t]here is no allegation of physical injury to or destruction of tangible property in the Amended Petition."** (Plaintiff's Exhibit 21, p. 1)(emphasis original). The Defendants' analysis of the duty to defend failed to comply with Oklahoma law, in that it was limited to a cursory review of the Williamses' allegations.

C. **The Defendants Fail To Distinguish The Controlling Rule Of Law Set Forth In The Conner v. Transamerica Ins. Co. Decision.**

The Defendants next argue that their promise to defend "groundless, false or fraudulent" claims was illusory. According to them, that policy term imposes no greater duty to defend than

is required by the general rules contained in the First Bank of Turley case. It remains clear, however, pursuant to Conner v. TransAmerica Insurance Company, 1972 OK 64, 496 P.2d 770 and its progeny, that the Defendants' promise to defend groundless claims dramatically expands the Defendants' defense obligations.

The Defendants try to distinguish Conner on the basis that the policy in Conner contained terms that were materially different than the terms of the Boggses' policies. This Court is invited to compare the policy terms from Conner and this case. The Conner policy obligated the insurer to:

> defend any suit against the insured alleging such act or omission and seeking damages which are payable under the terms of this policy, even if any of the allegations of the suit are groundless, false or fraudulent . . . .

Id. at 773. By contrast, the promise that the Defendants made to the Boggses was that:

> We will defend a covered person against any suit seeking covered damages for personal injury or property damage. We provide this defense at our own expense, with counsel of our choice, even if the suit is groundless, false, or fraudulent.

(See Plaintiff's Undisputed Fact Nos. 22-23).

The Defendants take two stabs at distinguishing the Conner policy terms. First, they contend that the Boggses' insurance policies "separate the defense of groundless, false or fraudulent allegations language from the general agreement to provide a defense." (Defendants Response, p. 4). It is difficult to understand what the Defendants even mean by that statement. Apparently, the Defendants want to emphasize that the Conner policy set forth a promise to defend and a promise to defend "groundless, false or fraudulent" allegations in one sentence, whereas the Boggses' policies broke the promise to defend claims and groundless claims into two sentences. That is a distinction without a difference. After promising to provide a defense, the Defendants agree to "provide *this defense* . . . even if the suit is groundless, false, or

3

fraudulent." No reasonable insured could possibly conclude that the Policies somehow decouple the general duty to defend from the agreement to defend groundless suits.

Next, the Defendants argue that <u>Conner</u> does not apply because the Boggses' policies only agreed to provide a defense for "covered damages." However, the <u>Conner</u> policy likewise limited the scope of the duty to defend to suits seeking "damages which are payable under the terms of this policy." There is no difference between agreeing to provide a defense for "covered damages" and agreeing to defend claims for "damages which are payable under the terms of this policy." The insurer in <u>Conner</u> merely used eight more words to convey the same meaning.

The Defendants also urge this Court to gut the promise to defend groundless claims by reference to inapposite case law. For example, the defendants cite to <u>Massachusetts Bay Ins. Co. v. Gordon</u>, 708 F.Supp. 1232 (W.D. Okla. 1989). However, in that case the defendant was sued for an intentional battery that the tort-feasor/insured admitted to having committed. <u>Id.</u> at 1232-33. Moreover, the policy did not include a promise to defend groundless suits. <u>Id.</u> As might be expected, the court ruled that the insurer did not owe a defense. <u>Id.</u> at 1234.

Next, the Defendants rely on <u>United States Fidelity & Guaranty Co. v. Briscoe</u>, 1951 OK 386, 239 P.2d 754, 758. However, the policy in <u>Briscoe</u> also did not promise the insured a defense of groundless suits. Moreover, the <u>Conner</u> court distinguished <u>Briscoe</u> on that basis. <u>Conner</u>. 496 P.2d at 775. The Boggses' basic point, which the Defendants either fail to comprehend or consciously ignore, is that due to the Policies' terms, the general rule set forth in <u>Briscoe</u> does not apply in this case.

Under Oklahoma law, an insurer's agreement to defend groundless suits is a significant, independent agreement. It is a promise to protect that insured from the expenses of a bogus lawsuit that may not even be covered under the indemnity portions of the policy. A defense is

4

owed even for claims that do not arise out of an accident. Ultimately, the Defendants contend that <u>Conner</u> and its progeny go too far in protecting insureds from groundless claims. However, they cannot avoid the effect of this well-established precedent by disagreeing with it. The undisputed facts demonstrate that the Williamses suit was groundless. On that basis, the Boggses reasonably expected that their better-than-"conventional" coverage would provide a defense.

**D.    The Defendants Never Denied Coverage Based On A Policy Period Defense, And They Cannot Raise That Baseless Argument Now.**

It also appears that the Defendants have invented a brand new justification for their coverage denial – that the Boggses damages happened outside of the relevant policy period.[1] The Defendants have never previously made that assertion, which lacks a factual basis. The undisputed facts establish that the Policies were in force "at all relevant times." (<u>See</u> Boggses' Statements of Undisputed Fact Nos. 22, 23). Also, the policy declarations demonstrate that they were in force before and after the Boggses sold the House to the Williamses. (<u>See</u> Insurance Policies, Boggses' Exhibits "22 and "23").

The Defendants also assert that, as a legal matter, the House sale terminated the Boggses' liability coverage. They cite to no case law that supports that novel assertion. It is true that the Boggses' first party insurance on the house itself would have been rendered void by a sale of the house, due to the lack of any continuing insurable interest in the house for purposes of property coverage. <u>See</u> <u>generally</u> <u>Okla. Stat.</u> tit. 36, § 3605; <u>Delk v. Markel American Ins. Co.</u>, 2003 OK 88, 81 P.3d 629. However, it does not follow that the liability coverage afforded by the Policy

---

[1] The Defendants have primarily raised this issue at pages 3-4 of their Reply Brief in support of the Defendants' own Motion for Summary Judgment. However, the Defendants also incorporate this "policy period" issue at page 7 of their Response to the Boggses' Motion for Partial Summary Judgment. Accordingly, the Boggses will address this issue in this Reply Brief.

5

similarly evaporated. The Boggses still had a need for general personal liability coverage without regard to where they lived at a given moment. Moreover, the umbrella policy provided nothing but liability coverage and was unconnected to a particular dwelling.

E.  **The Undisputed Evidence Continues To Establish That The Boggses Faced Potential Liability For Property Damage In The Williamses' Lawsuit.**

   1.  **The Williamses Sought "Property Damage" When They Alleged That The Boggses' Negligent Misrepresentations Created A Need To Demolish A Substantial Part Of The House.**

The Defendants seem to contend that the Boggses can only show that they have been sued for "property damage" if this Court interprets the policy to cover "loss of use" damages. As has and will be explained again, the homeowners policy covers "loss of use" damages. However, the Boggses also faced potential liability to the Williamses for *physical injury* to the House, in the form of injury to parts of the house adjacent to the chimneys when the chimneys were demolished. Esicorp, Inc. v. Liberty Mut. Ins. Co., 193 F.3d 966, 969-70 (8th Cir. 1999) and Economy Mut. Ins. Co. of North America, 157 Cal.App.3d 641, 651, 204 Cal.Rptr. 135, 140 n. 3 (1st Dist. 1984) both recognize that a claimant asserts a "property damage" claim when he seeks to recover the costs of making repairs that foreseeably will inflict new physical injury to property.

The Defendants argue that these cases are distinguishable or wrongly decided, but they do not explain why. The Defendants brush the Esicorp case under the rug by contending that "issues not related to the property damage determination were the primary focus of the case." (Defendants Response Brief, p. 16). That is not a fair characterization of the Esicorp opinion, which is, in fact, very pertinent to this Court's analysis of the "property damage" issue in this case.

In Esicorp, the question was whether Liberty Mutual was liable for its failure to defend an insured, Saint Louis Testing Laboratories, Inc. ("SLT"), for claims that had been asserted against SLT. Id. at 968. SLT had been hired to inspect shop welds in sections of pipe that were to be installed in an integrated pipe system "in the field." Id. After the sections of pipe had been installed in the field, it was discovered that SLT had negligently failed to inspect the pipe and that some welds were faulty. Id. The claimant, Esicorp, Inc., sued SLT alleging that it had been damaged due to increased costs to complete the construction project and by the need to replace the faulty welds. Id. at 968-69. SLT's insurer, Liberty Mutual, denied a defense, contending that there were no allegations of "property damage." Id. at 969. SLT entered a settlement with Esicorp that included an assignment to Esicorp of SLT's claims against Liberty Mutual. Id. The Esicorp opinion arises from the coverage litigation that ensued between Esicorp and Liberty Mutual.

The Defendants urge this Court to ignore the Esicorp ruling on the grounds that "issues not related to the property damage determination were the primary focus in the case." (Defendants' Response Brief, p. 16). The Defendants' effort to avoid the reasoning of Esicorp fails. In that case, there were two issues: (1) whether Liberty Mutual had incorrectly denied coverage on the basis that the insured had not been sued for "property damage"; and (2) if the coverage denial was wrong, what amounts the insurer owed after the insured settled the case and sought reimbursement. It is true that most of the content of the Esicorp case dealt with the ramifications of the insurer's coverage denial. However, the Esicorp court also directly addressed the question of whether Liberty Mutual had owed a defense in the first place.

In addressing the coverage question, the Esicorp court provided this analysis of whether SLT had faced a potential "property damage" claim:

7

> The policies defined property damage as "[p]hysical injury to tangible property, including all resulting loss of use of that property." Esicorp's complaint against SLT alleged that the first Penstock pipe sections were delivered to the project site in August 1989, that the sections were assembled and field welded as they arrived, that defective shop welds were first discovered in late December 1989, that work was suspended in May 1990, and that Esicorp incurred increased performance costs as a result of having to repair "rejectable defects." Like the district court, we conclude it was reasonably apparent to a liability insurer from these allegations that "property damage" to the pipe system, and perhaps to surrounding project property and equipment, would likely result from this type of on-site repair operation. Thus, while most of the damages alleged in Esicorp's complaint appeared to be economic losses, not covered property damage, Esicorp's complaint included allegations giving rise to a claim "potentially within the policy's coverage"-- unless this type of property damage was subject to a policy exclusion. The district court considered and rejected Liberty Mutual's contention that two exclusions applied, and Liberty Mutual has not appealed those rulings. Accordingly, we affirm the court's ruling that Liberty Mutual breached its duty to defend SLT in the underlying lawsuit.

Id. at 969-70.

The holding of the Esicorp case is that an insured faces a claim for "physical injury to tangible property" when the claimant alleges that the insured's negligence has created a need for repairs that probably will involve causing physical harm to property. That is also the clear ruling of the court in Economy Lumber Co., 157 Cal. App.3d at 651, 204 Cal. Rptr. at 140 n. 3, where the court recognized that a property damage claim would be asserted against the insured stucco contractor if "removing the defective stucco, unavoidably damaged the house."

At page 13 of their Response, the Defendants reveal a basic flaw in their denial of coverage. They assert that "in the instant case there were no allegations that (sic) any physical damage to property, other than the inclusion of the inadequate size flue." That is simply wrong. The Williamses explicitly pled damages in addition to the costs to repair the flues. The Williamses claimed that the Boggses' negligent misrepresentations literally required the demolition of a large part of the house. Under Oklahoma law, they could have recovered for that

alleged, consequential property damage in their lawsuit. Standing alone, that possibility created a duty for the Defendants to hire the Boggses a lawyer. The Defendants should now compensate the Boggses for the penny-wise, pound-foolish coverage denial.

**2.     The Boggses Faced Liability For Covered "Loss Of Use" Damages.**

In addition to failing to acknowledge that the Boggses faced liability for physical injuries to property, the Defendants continue to contend that the Boggses homeowners policy did not cover loss of use damages unless those damages were caused by physical injury. As has been explained, the Boggses' homeowners and umbrella policies defined the term "property damage" differently. The homeowners policy defines "property damage" to mean "physical injury to or destruction of tangible property, including the loss of its use." The umbrella coverage defines "property damage" to mean "physical injury to or destruction of tangible property and the *resulting* loss of its use." (emphasis added). The Defendants argue that these disparate definitions mean the same thing -- that both policies only cover "loss of use" damages that *result from* a physical injury to property.

Ultimately, this question is a matter of contract interpretation. Oklahoma's courts have long held that ambiguities in an insurance contract are construed most strongly against the insurer who drafted the policy. See Littlefield v. State Farm Fire & Cas. Co., 1993 OK 102, 857 P.2d 65, 69; Dodson v. St. Paul Ins. Co., 1991 OK 24, 812 P.2d 372, 376; Wilson v. Travelers Ins. Co., 1980 OK 9, 605 P.2d 137, 1329. In Max True Plastering Company v. United States Fidelity and Guar. Co., 1996 OK 28, 912 P. 2d 861, the Oklahoma Supreme Court expanded these long-standing, pro-insured rules by adopting the "reasonable expectations" doctrine for the interpretation of insurance contracts. In Max True, the court explained the need for and operation of that doctrine as follows:

> if the insurer or its agent creates a reasonable expectation of coverage in the insured which is not supported by policy language, the expectation will prevail over the language of the policy. The doctrine does not negate the importance of policy language. Rather, it is justified by the underlying principle that generally the language of the policy will provide the best indication of the parties' reasonable expectations. The standard under the doctrine is a "reasonable expectation"; and courts must examine the policy language objectively to determine whether an insured could reasonably have expected coverage.

Id. at 864-68. This rule resolves the meaning of ambiguous policy terms by giving ambiguous policy language the meaning that a reasonable person in the position of the insured would have understood the language to mean. Id. at 864.

The Boggses' homeowners policy contains a definition of "property damage" which, at the minimum, can be read two ways. Under one reading, "including loss of its use" implies some causal connection between the described physical injury to property, Under another reading, however, the word "including the loss of its use" merely modifies the word "property" and does not imply that the loss of use of property must *result from* any particular cause. The Court should resolve that ambiguity in the Boggses' favor.

Of course in this case there is more. The Defendants are two related insurance companies who both do business as "Chubb" companies. The Defendants sold two policies to the Boggses through a single agent, as a package of coverages. The claims for all policies were handled by the same adjuster. In this context, it is significant that the umbrella policy explicitly requires that loss of use damages *result from* a physical injury to property to be covered and the homeowners policy does not. The failure of the homeowners policy to include language requiring a causal link between a physical injury to property and the "resulting" loss of use highlights the ambiguity contained in the Homeowners Policy's definition of property damage. The Boggses reasonably can infer that: (1) the two policies define the term "property damage" differently for a

reason; and (2) the difference between the two definitions is that the homeowners policy covers loss of use damages without regard to any "physical injury" requirement. Stated more simply, if Great Northern only intended to cover loss of use damages that result from a physical injury or destruction of property, it needed to make that clear.

Applying the homeowners policy's "property damage" definition expands the scope of coverage beyond the potential physical injury to the House from the allegedly necessary repairs. The Williamses also claimed that they could not use the fireplaces, and the proposed repairs would have involved a loss of use of large portions of the house.

### 3. The Williamses Asserted A Property Damage Claim By Alleging That The Chimneys Were A Hazardous Condition That Had To Be Replaced.

The Defendants also fail to adequately address the many cases cited by the Boggses that impose liability coverage for the costs of addressing a hazardous condition. For example, the Boggses' opening brief pointed out that, in Jares v. Ullrich, 667 N.W.2d 843 (Wis. Ct. App. 2003), the court resolved a case very similar to this one against a Chubb company, and which involved policy terms identical to those contained in the Boggses' homeowners policy. The Defendants are forced to concede that the Jares court held that the insured faced a "property damage" claim when sued for a pre-existing animal infestation in a house that was sold to the claimant. The Defendants response to the Jares case is to proclaim, citing no authority whatsoever, that it represents a "minority viewpoint." The Defendants also surmise that the Jares case conflicted with Smith v. Katz, 595 N.W.2d 345 (Wis. 1999), even though the Jares case cites to Smith v. Katz as the basis for its ruling. See Jares, 667 N.W.2d at 847-48. The Defendants also ignore the fact that the Wisconsin Supreme Court, declined to review the Jares case. See 671 N.W.2d 851 (Wis. 2003).

The Boggses also presented this Court with numerous cases in which courts treated the presence of a hazardous condition that required repairs as a form of "property damage." The Defendants' basic response is that the only type of "hazardous condition" that qualifies for that treatment involved asbestos, which is, for some unexplained reason, given special treatment. Of course, the Boggses also explained that Courts have treated the inclusion of various hazardous substances *other than* asbestos in a similar manner. However, the Defendants argue that all of those cases are inapplicable because they involved "food products." It remains unclear why food products are a special category.

Some of the cases cited by the Boggses did not involve either asbestos or food products. See Cyprus Amax Minerals Co. v. Lexington Ins. Co., 74 P.3d 294 (Colo. 2003)(remediation costs to address mine collapse treated as "property damage"); Sheets v. Brethren Mut. Ins. Co., 679 A.2d 540 (Md. 1996)(costs to replace septic system treated as "property damage"). The Defendants argue that those cases are distinguishable, because they addressed different definitions of "property damage." Specifically, the Defendants urge this Court that these cases were decided against the insurer because policies in those cases defined "property damage" to include loss of use of property. In reality, the Courts in those cases did not find that to be dispositive. Moreover, as has been demonstrated, the Bogges' homeowners policy covers "loss of use" damages.

The Boggses concede that they have been unable to locate any pertinent case involving the need to remove hazardous chimneys, which apparently is not a common basis for a lawsuit. However, the *reasoning* of all of these opinions is that when repairs must be made to eliminate a health hazard that already exists, the repair costs are a form of property damages. That reasoning applies with equal force in this case.

F.  **The Defendants Diplomatically Have Abandoned Their Argument That The Boggses' Potential Liability Did Not Arise From An Accident.**

As the Boggses' opening Brief explained, the Policies cover claims from an "occurrence," which is defined to mean an "accident." Under Oklahoma law, an insured's conduct qualifies as an "accident," for purposes of liability coverage, unless the insured intends both the act and the resulting harm. Penley v. Gulf Ins. Co., 1966 OK 84 ¶ 20,, 414 P.2d 305, 309. The undisputed evidence is that the Williamses sued the Boggses for negligent misrepresentation, a cause of action that depends upon the *lack* of intent to cause harm. Moreover, the evidence proves that the Boggses were ignorant of any defect in the chimneys. In their Response Brief, the Defendants do cease arguing that there was no "occurrence." Instead, they assert that the existence of an occurrence "is but one small part of the requirements for invoking coverage . . . ."

G.  **The Defendants Have Not Provided Any Explanation For How The Policy Exclusions Eliminate The Duty To Defend Or Indemnify.**

Although the Defendants devote two pages of argument to the liability coverage exclusions, the Defendants never actually confront the terms of any applicable exclusion. The two exclusions the Defendants have relied upon are for: (1) intentionally caused damages; and (2) damages to the Boggses own property. The undisputed facts prove the irrelevance of those exclusions. Once again, all of the evidence demonstrates that the Boggses did not intentionally lie to the Williamses. The Williamses sought damages for injury to property that the Williamses owned.

The Defendants instead cite to an exclusion from the homeowners policy's coverage for the dwelling. The Defendants point out that the first-party coverage for loss to the structure contained an exclusion for faulty workmanship. Of course, the Boggses are not seeking

13

coverage under the homeowners policy's first-party structure coverage. They are seeking recovery under the policy's liability coverage. If the Defendants wanted to include a "faulty workmanship" exclusion in the policy's liability coverage, they could have done so.

The Defendants' reliance on a faulty workmanship exclusion for first-party property coverage is a red herring. For example, there would be no basis for denying coverage to Mr. Boggs if, as part of charity work, he completed negligence repairs to a house that cause a third party to sustain property damage and was sued as a result. The existence of a "faulty work" exclusion in the coverage for the House's structure would be irrelevant in that context. It is similarly irrelevant here, even though the property that sustained damages was the House that Great Northern insured.

**H. The Defendants Owe Indemnity For The Boggses' Good Faith Settlement.**

The undisputed evidence proves that the Williamses claims against the Boggses fell within the policies' insuring clauses and that no exclusions apply to eliminate coverage. The Boggses entered into a patently reasonable settlement that was for the mutual benefit of the Boggses and the Defendants. The Defendants have not even attempted to suggest otherwise. In accordance with the authorities set forth in the Boggses' opening brief, the Defendants should be required to reimburse the Boggses for their settlement.

## **CONCLUSION**

The Court should find and order that the Defendants are liable for the Boggses' defense costs in the total amount of $45,551.25 and indemnity costs in the amount of $37,000.00.

Respectfully submitted,

SMILING, MILLER & VAUGHN


By  s/J. Anthony Miller
  A. Mark Smiling - OBA # 10672
  J. Anthony Miller - OBA # 10404
  R. Lawson Vaughn, III – OBA# 21557
  9175 South Yale, Suite 150
  Tulsa, OK  74137-4044
  (918) 477-7500
  tmiller@smilinglaw.com

**CERTIFICATE OF MAILING**

    I, J. Anthony Miller, hereby certify that on the 24th day of August, 2009, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Kerry R. Lewis
Mr. John Tucker
Rhodes, Hieronymus
100 West 5th Street, Suite 400
Tulsa, OK  74103-4287


   s/J. Anthony Miller
   J. ANTHONY MILLER