# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DAVID BOGGS and SUE BOGGS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 08-CV-0660-CVE-PJC |
| | ) | |
| GREAT NORTHERN INSURANCE | ) | |
| COMPANY and FEDERAL INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Now before the Court are Defendants Great Northern Insurance Company and Federal Insurance Company's Motion for Summary Judgment Regarding Insurance Coverage, Dkt. # 18, and Plaintiffs' Motion for Partial Summary Judgment, Dkt. # 25. Defendants Great Northern Insurance Company (GN) and Federal Insurance Company (FIC) (together, the Insurance Companies) request summary judgment on the plaintiffs' claim of breach of contract and violation of the duty of good faith and fair dealing. Plaintiffs David and Sue Boggs (together, the Boggses) request partial summary judgment on their claims of breach of contract due to the Insurance Companies' refusals to indemnify or provide a defense to the Boggses. No party argues that genuine issues of material fact exist that would preclude summary judgment on either claim.[1]

---

[1]   The Boggses request summary judgment as to the breach of contract claim only. However, they failed to respond to any of the Insurance Companies' arguments regarding the bad faith claims, nor do they raise any triable issues regarding bad faith.

## I.

The following facts are undisputed. This case arises out of a dispute over the Boggses' sale of a residence located at 5009 East 117th Street in Tulsa, Oklahoma (the Residence) to Kenneth and Cynie Williams (the "Williamses") in 2003.[2]  In connection with this sale, the Boggses executed a residential disclosure form representing that all six fireplaces in the Residence were in good working order. Dkt. # 18 at 9; Dkt. # 26 at 8.  After the sale, the Williamses claimed that the fireplaces were not in good working order because they were constructed with flues that were not in compliance with local building codes.  Dkt. # 18 at 7; Dkt. # 26 at 8.  They claimed that the improperly constructed flues caused them to not draw exhaust properly and created a risk of carbon monoxide buildup in the Residence.  Id.  In a state court petition dated March 10, 2004, the Williamses sued the Boggses for allegedly misrepresenting the condition of the fireplaces in the Residence, stating claims for  violation of the disclosure requirements of OKLA. STAT. tit. 60, § 835 (regarding disclosure in sale of homes) and fraud in the inducement.  Dkt. # 26 at 9; Dkt. # 34 at 7.  On September 6, 2005, Kenneth Williams amended the petition to state claims for fraud in the inducement and deceit, negligent misrepresentation, and  negligence in failing to repair the fireplaces to meet building code standards (together, the Underlying Claims)[3].  Dkt. # 18 at 8; Dkt. # 26 at 9.  The Williamses alleged that "the cost of restoring the fireplaces at the . . . Residence to normal working order exceeds Four Hundred Nineteen Thousand Dollars " and that they suffered actual damages in the amount of at least $419,000.00.  Dkt.# 18, Ex. 1, at 2-4; Dkt. # 26, Ex. 15, at

---

[2]      The Residence was built in 1995.  Dkt. # 26 at 7; Dkt. # 34 at 7.

[3]      It is unclear from the summary judgment record why only Mr. Williams filed the amended petition.  Hereinafter, this Court will refer to the Underlying Claims as the Williamses' claims.

2-4. The Williamses also asserted third-party claims against the builder of the Residence. Dkt.# 18, Ex. 1, at 4; Dkt. # 26, Ex. 15, at 4. The Boggses settled the Williamses' claims in December 2006. Dkt. # 26 at 10.

GN issued a homeowners and liability insurance policy to the Boggses, effective November 30, 2002 through November 30, 2003 (the GN Policy). Dkt. # 18, Ex. 3, at 3; Dkt. # 26, Ex. 22, at 2. FIC issued an excess liability insurance policy to the Boggses, also effective November 30, 2002 through November 30, 2003 (the FIC Policy) (together with the GN Policy, the Policies).[4] Dkt. # 18, Ex. 4, at 2; Dkt. # 26, Ex. 23, at 2. Both policies were in effect during the time the Boggses sold the Residence to the Williamses.

The Boggses repeatedly requested that the Insurance Companies assume their defense in the Williamses' case. Dkt. # 26 at 10; Dkt. # 34 at 7. The Insurance Companies refused, stating that the Underlying Claims were not covered under either Policy. Dkt. # 26 at 10; Dkt. #34 at 7. The Boggses now claim that the Insurance Companies had duties to defend and indemnify them against the Underlying Claims, and that by refusing they breached the insurance contracts and violated their duties of good faith and fair dealing.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986);

---

[4]     The excess liability policy was originally issued by Northwestern Pacific Insurance Company. It appears from the parties' correspondence regarding the Boggses' requests for coverage that FIC assumed Northwestern Pacific Insurance Company's obligations under the excess liability policy. See, e.g., Dkt. # 26, Ex. 12, at 7 (acknowledging FIC's receipt of the Williamses' original petition).

Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

The Insurance Companies seek summary judgment on the Boggses' claims for breach of contract and bad faith.  The Insurance Companies argue that they had no duties to indemnify or defend the Boggses against the Underlying Claims because those claims were not covered under

either of the Policies.  Further, the Insurance Companies argue that they did not act in bad faith because their denials were based on a legitimate dispute over coverage, and denial of a non-covered claim cannot amount to bad faith.  The Boggses ask this Court to deny the Insurance Companies' motion for summary judgment, and to grant their motion for partial summary judgment on the breach of contract claim.  They argue that Underlying Claims are covered and therefore trigger the duty to indemnify, and that the Insurance Companies had a duty to defend even those claims that may not have been covered by the duty to indemnify.

**A.      Insurance Contract Construction**

"The interpretation of an insurance contract is governed by state law and, sitting in diversity, we look to the law of the forum state." Houston Gen. Ins. Co. v. Am. Fence Co., Inc., 115 F.3d 805, 806 (10th Cir. 1997) (applying Oklahoma insurance law).   In Oklahoma, interpretation of an insurance contract is a matter of law.  Max True Plastering Co. v. U.S. Fid. and Guar. Co., 912 P.2d 861, 869 (Okla. 1996).  The insured has the burden of showing that its claim is covered under the policy.  See U.S. Fid. and Guar. Co. v. Briscoe, 239 P.2d 754, 756 (Okla. 1952) (noting that "the contractor must bring himself within the terms of the policy, before he can establish insurer's liability thereon); see also Pitman v. Blue Cross and Blue Shield of Okla., 217 F.3d 1291, 1298 (10th Cir. 2000) ("the insured has the burden of showing that a covered loss has occurred").   Once the insured establishes coverage, "the insurer has the burden of showing that a loss falls within an exclusionary clause of the policy." Pitman, 217 F.3d at 1298.  Therefore, summary judgment in favor of the insurer is proper when the undisputed facts show that the insured has failed to establish a covered claim under its insurance policy.  See, e.g., VBF, Inc. v. Chubb Group of Ins. Cos., 263 F.3d 1226 (10th Cir. 2001) (affirming the district court's grant of summary judgment to the insurers

where the undisputed facts established that, under Oklahoma law, the insured's claims were not covered under any of the policies).

In interpreting the Insurance Policies, this Court applies the Oklahoma rules of construction. See id. at 1230.  Under Oklahoma law, an insurance contract should be construed according to the terms set out within the four corners of the document.  First American Kickapoo Operations, L.L.C. v. Multimedia Games, Inc., 412 F.3d 1166, 1173 (10th Cir. 2005); Redcorn v. State Farm Fire & Cas. Co., 55 P.3d 1017, 1020 (Okla. 2002); London v. Farmers Ins. Co., Inc., 63 P.3d 552, 554 (Okla. Civ. App. 2002).  If the terms of the contract are "unambiguous, clear and consistent, they are to be accepted in their ordinary sense and enforced to carry out the expressed intention of the parties."  Roads West, Inc. v. Austin, 91 P.3d 81, 88 (Okla. Civ. App. 2004).  A court should not create an ambiguity in the policy by "using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on a provision."  Wynn v. Avemco Ins. Co., 963 P.2d 572, 575 (Okla. 1998).  A policy term will be considered ambiguous only if it susceptible to more than one reasonable interpretation.  Max True, 912 P.2d at 869.  However, the Oklahoma courts "will not impose coverage where the policy language clearly does not intend that a particular individual or risk should be covered," and neither a "split in authority over whether a certain term is ambiguous," nor "the fact that the parties disagree" alone is sufficient to establish an ambiguity.  BP Amer., Inc. v. State Auto Prop. & Cas. Ins. Co., 148 P.3d 832, 835-36 (Okla. 2005).

"The general declaration of insurance coverage, as established by the insurance policy and limited by its provisions, normally determines the insurance carrier's liability, and the insured's respective rights under the contract by identifying what risks are covered and excluded by the

policy." Dodson v. St. Paul Ins. Co., 812 P.2d 372, 377 (Okla. 1991).  Any exclusions to general

coverage:

> are read seriatim; each exclusion eliminates coverage and operates independently
> against the general declaration of insurance coverage and all prior exclusions by
> specifying other occurrences not covered by the policy.  Thus, subsequent
> exclusions can further limit or even remove a covered risk from the general
> declaration of insurance coverage. In case of doubt, exclusions exempting certain
> specified risks are construed strictly against the insurer.

Id. (footnotes omitted).

**B.      The Insurance Policies**

The GN Policy contains the following personal liability coverage language:

> We cover damages a covered person is legally obligated to pay for personal
> injury or property damage which takes place any time during the policy period
> and are caused by an occurrence, unless stated otherwise or an exclusion
> applies.  Exclusions to this coverage are described in Exclusions.
>
> "Property damage" means physical injury or destruction of tangible property,
> including the loss of its use.

Dkt. # 18, Ex. 3, at 26; Dkt. # 26, Ex. 22, at 26.  "Occurrence" is defined in the "Definitions" section

of the policy as: "a loss or accident to which this insurance applies occurring within the policy

period."  Dkt.# 18, Ex. 3, at 10; Dkt. # 26, Ex. 22, at 10.

The GN Policy also contains the following defense coverage language: "We will defend a

covered person against any suit seeking covered damages for personal injury or property damage.

We provide this defense at our own expense, with counsel of our choice, even if the suit is

groundless, false, or fraudulent."  Dkt. # 18, Ex. 3, at 27; Dkt. # 26, Ex. 22, at 27.

The "Exclusions" section of the GN Policy's personal liability coverage states in relevant part:

> These exclusions apply to your Personal Liability Coverage, including the Extra Coverages, unless stated otherwise . . .
>
> Damage to covered person's property.  We do not cover any person for property damage to property owned by any covered person . . .
>
> Intentional Acts.  We do not cover any damages arising out of an act intended by any covered person to cause personal injury or property damage, even if the injury or damage is of a different degree or type than actually intended or expected.  An intentional act is one whose consequences could have been foreseen by a reasonable person.  But we do cover such damages if the act was intended to protect people or property unless another exclusion applies.

Dkt. # 18, Ex. 3, at 30-32; Dkt. # 26, Ex. 22, at 30-31[5].

The "General Conditions" section of the GN Policy states that "[a]ll coverages on this policy apply only to occurrences that take place while this policy is in effect."  Dkt. # 18, Ex. 3, at 35; Dkt. # 26, Ex. 22, at 34.

The FIC Policy contains the following relevant excess liability coverage language:

> We cover damages a covered person is legally obligated to pay for personal injury or property damage, caused by an occurrence . . . unless stated otherwise or an exclusion applies.
>
> Exclusions to this coverage are described in Exclusions . . .
>
> "Property damage" means physical injury to or destruction of tangible property and the resulting loss of its use.

---

[5]     The parties do not dispute the content of the GN Policy.  Dkt. # 18, Ex. 22 appears to be missing page T-7 of the Policy, which contains the "intentional acts" exclusion.

Dkt. # 18, Ex. 4 ,at 11-12; Dkt. # 26, Ex. 23, at 11-12.  "Occurrence" is defined in the "Definitions"

section as "a loss or accident to which this insurance applies occurring within the policy period."

Dkt. # 18, Ex. 4, at 9; Dkt. # 26, Ex. 23, at 9.

The FIC policy also contains the following defense coverage language:

> We will defend a covered person against any suit seeking covered damages for personal injury or property damage that is either: not covered by any underlying insurance; or covered by an underlying policy as each Defense Coverage has been exhausted by payment of claims.  We provide this defense at our expense, with counsel of our choice, even if the suit is groundless, false, or fraudulent.

Dkt. # 18, Ex. 4, at 12; Dkt. # 26, Ex. 23, at 12.

The "Exclusions" section of the FIC Policy states in relevant part:

> These exclusions apply to your Excess Liability Coverage, unless stated otherwise.

> Damage to covered person's property.  We do not cover any person for property damage to property owned by any covered person . . .

> Intentional acts.  We do not cover any damages arising out of an act intended by any covered person to cause personal injury or property damage, even if the injury or damage is of a different degree or type than actually intended or expected.   An intentional act is one whose consequences could have been foreseen by a reasonable person.  But we do cover such damages if the act was intended to protect people or property unless another exclusion applies.

Dkt. # 18, Ex. 4, at 13-14; Dkt. # 26, Ex. 23, at 13-14.

The "General Conditions"section of the FIC Policy states that "[a]ll coverages on this policy

apply only to occurrences that take place while this policy is in effect."  Dkt. # 18, Ex. 4, at 18; Dkt.

# 26, Ex. 23, at 18.

The relevant language in the GN and FIC Policies is identical, except for the definition of "property damage."  The GN Policy defines "property damage" as physical injury or destruction of tangible property, including the loss of its use,"  Dkt. # 18, Ex. 3, at 26; Dkt. # 26, Ex. 22, at 26, while the FIC Policy defines it as "physical injury to or destruction of tangible property and the resulting loss of its use."  Dkt. # 18, Ex. 4, at 11-12; Dkt. # 26, Ex. 23, at 11-12.  Accordingly, this Court will treat the two Policies as one, except when interpreting the definition of "property damage."

## C.    Duty to Indemnify

Whether the Insurance Companies had a duty to indemnify the Boggses against the Underlying Claims depends on whether those Claims were within the scope of the Policies' coverage. Each Policy covers "damages a covered person is legally obligated to pay for personal injury or property damage . . . caused by an occurrence, unless stated otherwise or an exclusion applies." Therefore, in order to establish coverage, the Boggses must show that the Underlying Claims are "damages for personal injury or property damage," and that the damage was "caused by an occurrence."

The Williamses' amended petition against the Boggses involved three types of claims: fraud and intentional misrepresentation, negligent misrepresentation of the fireplaces' condition, and negligence for failure to repair the fireplaces.  Dkt. # 18, Ex. 1, at 2-4.  The parties do not dispute that none of the Underlying Claims is for personal injury under the Policies.  However, the parties disagree as to whether any of the Underlying Claims are for "property damage" and whether the damage was "caused by an occurrence."

10

The Insurance Companies argue that the Underlying Claims were not for property damage caused by an occurrence because any damage to the property (the faulty fireplace construction) was not caused by the wrongful act claimed (the misrepresentation or failure to repair).  The Insurance Companies also argue that neither a fraudulent misrepresentation nor a negligent misrepresentation can be an "occurrence" under the Policies.  Additionally, the Insurance Companies argue that there are no duties to indemnify (or defend) because the Underlying Claims are excluded under the Policies' exclusions for intentional acts and damage to the insured's owned property.

The Boggses argue that the Underlying Claims are covered under the Policies.  Essentially, the Boggses argue that the Williamses stated claims for property damage because they asserted damages for the existence of the defective fireplaces and for the cost of repairing the fireplaces, both of which are property damage under the Policies.  The Boggses argue that negligent misrepresentation and negligence are "occurrences" under the Policies.[6]

1.      The Underlying Claims are not for "Property Damage"

The Oklahoma courts have not addressed the question of whether claims for misrepresentations in home sales are covered claims under liability insurance policies.  However, a number of other courts have held that claims alleging fraudulent or negligent misrepresentation in connection with the sale of a home are not claims for "property damage" under insurance policies like those at issue here.  See, e.g., St. Paul Fire & Marine Ins. Co. v. Lippincott, 287 F.3d 703 (8th Cir. 2002) (holding that, under Missouri law, a judgment for negligently misrepresenting the condition of a house's walls and foundation was not a liability for property damages); Safeco Ins. Co. of Am.

---

[6]      The Boggses do not argue that the alleged fraudulent misrepresentations are "occurrences" giving rise to a duty to indemnify, but they do argue that the Insurance Companies had a duty to defend against the fraud allegations.

v. Andrews, 915 F.2d 500 (9th Cir. 1990) (holding that damages from negligent failure to inform of unstable earth, faulty wiring, defective plumbing and water leakage were economic damages and therefore not covered property damage);  Aluise v. Nationwide Mut. Fire Ins. Co., 625 S.E.2d 260 (W. Va. 2005) (holding that damages for fraudulently or negligently misrepresenting the absence of structural damage and water seepage were economic and therefore not covered property damage); see also Lenning v. Commercial Union Ins. Co., 260 F.3d 574 (6th Cir. 2001) (applying Kentucky law); Shelter Mut. Ins. Co. v. Brown, 345 F. Supp. 2d 645 (S.D. Miss. 2004);  Allstate Ins. Co. v. Morgan, 806 F. Supp. 1460 (N.D. Cal. 1992); Huffhines v. State Farm Lloyds, 167 S.W.3d 493 (Tex. App. 2005);  Devin v. United Servs. Auto. Ass'n, 6 Cal. App. 4th 1149 (Cal. Ct. App. 1992); Qualman v. Bruckmoser,471 N.W.2d 282 (Wis. Ct. App. 1991);  Lawyer v. Kountz, 716 So. 2d 493 (La. Ct. App. 1998);  Dixon v. Nat'l Am. Ins. Co., 411 N.W.2d 32 (Minn. Ct. App. 1987);  but see Jares v. Ullrich, 667 N.W.2d 843 (Wis. 2003) (finding covered property damage where the complaint alleged an inability to occupy the property and could be read to imply that the residence was damaged because of an undisclosed animal infestation); Wood v. Safeco Ins. Co. Of Am., 980 S.W.2d 43 (Mo. 1998) (finding that allegations of flood water in the residence due to negligent misrepresentations regarding flooding "sufficiently implicate[d]"  the loss of use provision of the policy's definition of property damage to trigger duty to defend); Sheets v. Brethren Mut. Ins. Co., 342 Md. 634 (Md. 1996) (finding that alleged loss of use of property after seller's negligent misrepresentation of condition of septic system was property damage under the policy).

For example, in Aluise, the West Virginia Supreme Court held that a homeowner's liability policy did not cover claims against the insured for misrepresentations in connection with the sale of a home.  In that case, the insureds, the Forsseniuses, sold their home to the Aluises.  The Aluises sued

the Forsseniuses for negligent and intentional misrepresentation, due to the Forsseniuses' failure to disclose structural and water seepage problems with the house at the time of sale. 625 S.E.2d 260 at 268. The relevant language in the Forsseniuses' policy stated that "'Nationwide 'will pay damages which the insured is legally obligated to pay due to an occurrence[.]' The policy defined 'occurrence' as follows: Occurrence means bodily injury or property damage resulting from an accident . . . ." Id. (footnotes omitted). The policy defined "property damage" as "physical injury to or destruction of tangible property. This includes resulting loss of use." Id. at 268 n. 12. The West Virginia court reviewed a number of similar cases from other states, and concluded "[b]ased upon the overwhelming authorities," that the policy did not "provide coverage for an insured homeowner who is sued by a home buyer for economic losses caused because the insured negligently or intentionally failed to disclose defects in the home." Id. at 268-69. The court contrasted "property damage or bodily injury," which would be covered under the policy, with the "damages for economic losses [the Aluises] sustained as a result of the negligent failure of the Forsseniuses to disclose defects in the home at the time of sale." Id. at 269. The Aluises' damages were not covered. Id.

Similarly, in St. Paul, the Eighth Circuit upheld the district court's grant of summary judgment to the insurance company, holding that the policies at issue did not cover a judgment for fraudulent and negligent misrepresentation against the insureds. 287 F.3d at 705. The insureds, the Lippincotts, falsely represented that they were unaware of past flaws in the walls or foundations of their property when they sold it to the Thompsons. The Thompsons recovered judgment against the Lippincotts on their negligent misrepresentation claim. The Eighth Circuit held that St. Paul had no duty to indemnify the Lippincotts against the judgment because "the Thompsons' judgment was clearly not a recovery for property damage under the policies." Id. In that case, "[t]he primary

13

insurance policy defined 'property damage' as 'damage to someone else's property or its loss or destruction and the loss of its use.'  The umbrella policy defined 'property damage' as damage to 'tangible property or its loss or destruction' and 'the loss of its use.'"  Id.  The court concluded that the Thompsons' judgment "covered the intangible losses incurred when the Thompsons relied to their economic detriment upon the Lippincott's misrepresentations."  Id. at 706.  Therefore, the Thompsons' damages were "pecuniary in nature" and "not property damage within the meaning of the St. Paul insurance policies."  Id.

The Underlying Claims in this case are economic or pecuniary in nature, and are likewise not property damage under the Insurance Policies.  The Underlying Claims are similar to those in Aluise, where the complaint "essentially alleged that the Aluises sustained damages as a result of the failure of the Forsseniuses to disclose a structural and water seepage problems [sic] in the home."  625 S.E.2d at 268.  The West Virginia court concluded that the Aluises' suit was for economic losses, rather than "property damage" under the policy.  Id.  The same is true here.  In this case, the Williamses asserted that, as a result of the Boggses' alleged fraudulent and negligent misrepresentations and negligence, they suffered "actual damages exceeding $419,000.00."[7]  Dkt. # 18, Ex. 2, at 2-4; Dkt. # 26, Ex. 15, at 2-4.  They alleged that the "cost of restoring the fireplaces to normal working order exceeds $419,000.00."  Dkt. # 18, Ex. 2, at 2; Dkt. # 26, Ex. 15, at 2.  The

---

[7]     The Williamses also asserted a claim for exemplary damages pursuant to OKLA. STAT. tit. 23, § 9.1(C).  Dkt. # 18, Ex. 2, at 3; Dkt. # 26, Ex. 15, at 3.  Oklahoma law prohibits insurance companies from indemnifying insureds against claims for exemplary damages in cases such as this one.  E.g., Dayton Hudson Corp. v. Am. Mut. Liability Ins., 621 P.2d 1155, 1160 (Okla. 1980).  Therefore, the Williamses' claim for exemplary damages was not covered under the Policies.

Underlying Claims are for the costs associated with repairing the fireplaces, which are economic damages.  These are not the sort of damages contemplated by Policies.

The holdings in <u>Jares</u>, 667 N.W.2d 843, <u>Wood</u>,980 S.W.2d 43, and <u>Sheets</u>, 679 A.2d 540, are not persuasive in this case. In <u>Jares</u>, the Court of Appeals of Wisconsin adopted a view of property damage that the Wisconsin Supreme Court had previously recognized as a minority viewpoint.  <u>See Smith v. Katz</u>, 595 N.W.2d 345, 354 (Wis. 1999) ("[W]e recognize that the majority view in the cases is that misrepresentations and omissions do not produce 'property damage' as defined in the insurance policies.  They produce economic damage.").  Further, the property damage in each of these cases is different than the one at hand.  In <u>Jares</u>, the homeowners failed to disclose an animal infestation.  <u>Jares</u>, 667 N.W.2d at 845.  In <u>Wood</u>, the homeowners failed to disclose how frequently the property flooded.  980 S.W.2d at 45.  In <u>Sheets</u>, the homeowners failed to disclose the condition of the septic system.  679 A.2d at 541.  In each case, the alleged property damage happened after the purchasers moved into the house.  For example, in <u>Wood</u> the house flooded and was damaged <u>after</u> the buyers moved in.  980 S.W.2d at 47.  Because of the difference in the nature of the damage alleged, and the fact that these cases represent a minority viewpoint, this Court does not find that <u>Jares</u>, <u>Wood</u>, or <u>Sheets</u> should dictate the result in this case.

The basic assumption that general liability policies do not cover damages for breach of contract supports this Court's conclusion that the Underlying Claims are not for covered property damage.  The Policies provide liability coverage for "damages a covered person is legally obligated to pay for personal injury or property damage." "The phrases 'legally obligated to pay' and 'liability imposed by law' refer only to tort claims and not contract claims."  <u>VBF</u>, 263 F.3d at 1231; <u>see also</u> 7A Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 103:19 (3d ed. 2009) ("[L]iability

based upon contract is generally excluded from coverage" in general liability policies."). The Underlying Claims are all essentially contract claims. Although the Williamses' amended complaint includes allegations of "negligent misrepresentation" and "negligence," which sound tort-like, "this clever drafting does not change the underlying nature" of the Underlying Claims. VBF, 263 F.3d at 1231. Though labeled with tort language, the claims all stem from the breach of the contract for sale and from alleged misrepresentations in the property disclosure certificate.[8]

The Boggses did not damage the Williamses' property when they sold the Residence without disclosing the fireplaces' condition or repairing the fireplaces -- they breached a contract. The Underlying Claims are for economic damages. Accordingly, the Williamses' claims did not give rise to "damages a covered person is legally obligated to pay for . . . property damage." To find coverage in this case would convert the Policies from homeowners' insurance into "warranties upon sale." Aluise, 625 S.E.2d at 267, see also Kountz, 716 So.2d at 498 ("To find coverage existed in this case would be to find that based on an act of sale, a homeowner's insurer becomes the warrantor of the condition of the insured property.").

However, the Boggses urge this Court to focus on specific harms, rather than the basis for liability on the Underlying Claims. The Boggses argue that the Williamses' repairs to the fireplaces would cause property damage to the Residence because the repairs would require that the interior chimneys be demolished and rebuilt, causing damage to the rest of the house. They argue that "if repairs necessitate destruction of other property, then 'property damage' exists for coverage

---

[8] Oklahoma law limits recovery for failure to disclose known defects in a disclosure statement to "actual damages," and specifically excludes exemplary damages. OKLA. STAT. tit. 60, § 837(3)(B). Therefore, any potential damage award for "known" defects in the Residence's fireplaces would have been limited to contract damages and excluded excess tort damages.

purposes."[9]  Dkt. # 26 at 22.  Next, the Boggses argue that the Williamses asserted a claim for loss

of use of the fireplaces, and that such a claim is for property damage under the Policies.  Id. at 23.[10]

Last, they argue that the Williamses "alleged that the defective chimneys constituted an

environmental safety hazard," id. at 20, and that claims for the inclusion of such a safety hazard in

the house and claims for the cost of repairing such a condition are claims for "property damage."

None of these arguments changes the fact that the Williamses' claims were for economic damages

arising out of the Boggses' alleged breach of contract.  Whether or not potential repairs or apparent

loss of use could theoretically be property damage under a homeowners' insurance policy, the

Underlying Claims in this case are not for property damage.  They are for economic damages suffered

as a result of a home sale.

---

[9]    The Boggses cite Esicorp, Inc. v. Liberty Mut. Ins. Co., 193 F.3d 966 (8th Cir. 1999)
(applying Missouri law); and Economy Lumber Co. v. Insurance Co. of North America, 204
Cal. Rptr. 135 (Ct. App. 1984), to support this argument.  However, the policies at issue in
both of these cases were commercial general liability policies, not homeowners' policies.
The two types of policies provide different types of coverage.  Compare generally RUSS &
THOMAS, supra ch. 128 ("Risks and Losses Specific to Homeowners' and Farmowners'
Liability Policies") with RUSS & THOMAS, supra ch. 129 ("Risks and Losses Specific to
Commercial General Liability Policies").  Therefore, these cases are not persuasive.

[10]   The parties disagree over whether the GN Policy's definition of property damage as
"physical injury to or destruction of tangible property, including the loss of its use," Dkt. #
18, Ex. 3, at 26; Dkt. # 26, Ex. 22, at 26, (emphasis added), should be read to cover the loss
of use of the fireplaces that was not caused by physical injury or destruction.  This Court will
assume that the policy language is ambiguous, and will construe this ambiguity in the
Boggses favor.  See Amer. Econ. Ins. v. Boghan, 89 P.3d 1051, 1054 (Okla. 2004).
However, the result in this case is the same whether the GN Policy covers loss of use
independent of physical injury to property or not, because the property damage was not
caused by an occurrence.  See III.C.2., infra.

Even assuming that the Boggses are correct and that under Oklahoma law the Underlying Claims <u>are</u> claims giving rise to liability for "property damage" under the Policies, these claims would still not create duties to indemnify, because the claimed "property damage" was not caused by an occurrence.

2.      <u>Any "property damage" was not "caused by an occurrence"</u>

The Policies provide coverage for "damages . . . for . . . property damage . . . <u>caused</u> by an occurrence" (emphasis added).  Even if this Court assumes that the Underlying Claims are for property damage, that property damage still  must be caused by an occurrence under the Policies. An occurrence is "a loss or accident to which this insurance applies occurring within the policy period."

The parties disagree over whether a negligent misrepresentation[11] can be an "occurrence." Even assuming that the Boggses' alleged negligent misrepresentations are occurrences, they did not cause the property damage asserted in the Underlying Claims.[12]  Although the Oklahoma courts do not appear to have addressed this causation issue, several other courts have determined that no

---

[11]    The Boggses do not seem to dispute that an act of intentional misrepresentation cannot be an "occurrence" for the purposes of the duty to indemnify.  Since intentional misrepresentation requires intent or recklessness in the making of a false statement and intent to induce reliance on that statement, <u>F.D.I.C. v. Hamilton</u>, 122 F.3d 854, 858 (10th Cir. 1997) (applying Oklahoma law), an intentional misrepresentation is not a "loss or accident" and thus not an occurrence. <u>See Briscoe</u>, 239 P.2d at 756-57 (describing an "accident" under an insurance policy as an event that takes place "by some unexpected happening.").

[12]    Whether a negligent misrepresentation can ever be an "occurrence" is an unsettled question of law upon which the Oklahoma courts have not spoken.  State courts that have addressed the issue seem to be split.  For example, compare <u>Wood</u>, 980 S.W.2d at 49 <u>following</u> <u>Sheets</u>, 679 A.2d 540, with <u>Aluise</u>, 625 S.E.2d at 268-69.  For the purposes of these motions, this Court will assume that a negligent misrepresentation can be an occurrence under the Policies.

18

coverage exists because misrepresentations in home sales do not cause the condition that was misrepresented.  See, e.g., St. Paul, 287 F.3d at 706;  Safeco, 915 F.2d at 502;  State Farm Fire and Cas. Co. v. Brewer, 914 F. Supp. 140, 142-43 (S.D. Miss. 1996) ("The alleged misrepresentation of Defendants did not cause property damage. The termites caused the property damage.");  State Farm Fire and Cas. Co. v. Gwin, 658 So.2d 426, 428 (Ala. 1995);  Lawyer, 716 So.2d at 498;  Qualman, 471 N.W.2d at 367-68.

The Boggses' alleged misrepresentations may have caused the Williamses to purchase the Residence or to assume that the fireplaces were in working order.  However, these misrepresentations did not cause the purported property damage (damage to the rest of the house, loss of use, inclusion of a health hazard).  The Boggses' alleged misrepresentations had no effect on the condition of the fireplaces, because the fireplaces were defective when the house was built. Dkt. # 18, Ex. 1, at 3; Dkt. # 26, Ex. 15, at 6.  "Simply because the underlying facts deal with defects in the property sold does not" create a causal connection between the alleged negligent misrepresentations and the property damage asserted in the Underlying Claims. Qualman, 471 N.W.2d at 285.  The Williamses' negligent misrepresentation claim was not for "property damage caused by an occurrence" and was therefore not covered under the Policies.

Similarly, the Insurance Companies had no duties to indemnify the Boggses against the Williamses' negligence claim because any alleged negligence in failure to repair was not an occurrence that caused property damage.  The Boggses' attempt to circumvent the Policies' "owned property exclusion" (discussed in Part III.C.3., infra) by asserting that "as to the alleged need to repair the house, the event triggering coverage in this case . . . was . . . the Boggses' sale of the [Residence] to the Williamses" and "[t]he Williamses' ownership of the [Residence] is what caused their alleged

19

damages." Dkt. # 26 at 29. This argument fails. If the relevant occurrence was the sale of the Residence, then this occurrence did not cause the property damage. As discussed above, the property sale had no effect on the condition of the fireplaces. Ultimately, the Boggses' arguments regarding the negligent failure to repair claim fail for the same reason as the misrepresentation claims: they arise out of the alleged breach of the real estate contract, which did not <u>cause</u> any property damage. Further, the Williamses' negligence claim is excluded under the Policies' "owned property exclusion."

3.      <u>The Owned Property Exclusion Applies to the Negligence Claim</u>

The Policies exclude from coverage liability based on "property damage to property owned by any covered person." Any damage caused by the Boggses to their own property would not be covered. Other courts have found that owned property exclusions apply to claims that a house seller's negligence caused property damage. <u>See</u> <u>Lenning v. Commercial Union Ins. Co.</u>, 260 F.3d 574, 585 (6th Cir. 2001) (holding that, under Kentucky law, a policy's owned property exclusion applied to alleged damages for faulty house construction because insured was "the owner at the time the alleged damage occurred"); <u>see also</u> <u>Allstate Ins. Co. v. Chaney</u>, 804 F. Supp. 1219, 1223 (N.D. Cal. 1992) ("Since any of the "property damage" alleged by [buyer] necessarily had to have occurred prior to the date [buyer] came into possession of the premises, the Court finds that the policy excludes coverage for such damage.").

If this Court were to assume that the Boggses' alleged negligent failure to repair the fireplaces could be an occurrence, the Insurance Companies would still have no duty to indemnify against this claim because the owned property exclusion applies. If the Boggses' negligence were to have caused

any damage to the fireplaces,[13] this damage would have occurred while the Boggses owned the residence.[14]   Therefore, this damage would be to the <u>Boggses'</u> property, not the Williamses'.[15] Accordingly, the owned property exclusion removes the Williamses' negligence claim from coverage under the Policies.

The Underlying Claims did not involve "damages a covered person is legally obligated to pay for personal injury or property damage . . . caused by an occurrence, unless stated otherwise or an exclusion applies."  The Insurance Companies were under no obligation to indemnify the Boggses. Therefore, it is unnecessary for this Court to address the parties' arguments regarding the application of the intentional acts exclusion.  Because the Underlying Claims were not covered, the Insurance Companies' refusal to indemnify is not a breach of contract.

---

[13]   For the sake of argument, this Court assumes that the alleged negligent failure to repair caused the property damage.  In fact, the problems with the fireplaces occurred in 1995, when the Residence was built.  Dkt. # 26 at 7.

[14]   The Boggses argue that the Williamses' claim for damage to the house during the repair process is a claim for "<u>future</u> damages [that] would not have happened while the Boggses owned the home."  Dkt. # 26 at 29.  That is not true.  All damage to the fireplaces that created the need for repairs occurred while the Boggses owned the home; the Boggses confuse the need to remedy property damage with the property damage itself.

[15]   The Boggses' argument regarding the negligence claim also suffers from a timing problem. In order for the Boggses to be liable in negligence for failure to repair the fireplaces, they must have had a duty to repair the fireplaces.  <u>See</u> <u>Consol. Grain & Barge Co. v. Structural Sys., Inc.</u>, 212 P.3d 1168, 1171 n.8 (Okla. 2009) (elements of negligence include the existence of a duty).  The Boggses could only have had a duty to repair the fireplaces while the Boggses owned or controlled the fireplaces.  The Policies' owned property exclusions would apply during this time.  Once the fireplaces became the Williamses' property (and the owned property exclusion would not apply), the Boggses could not have had any duty to repair the fireplaces.

D.      **Duty to Defend**

The Boggses also claim that the Insurance Companies breached their contracts by refusing to provide a defense against the Underlying Claims.  The Policies promise to "defend a covered person against any suit seeking <u>covered damages</u> for personal injury or property damage.  We provide this defense . . . even if the suit is groundless, false, or fraudulent."(emphasis added).

In Oklahoma, the duty to defend is broader than the duty to indemnify.  However, the Oklahoma Supreme Court has repeatedly stated that "an insurer is not obligated to defend a groundless suit when it would not be liable under its policy for any recovery that could possibly be obtained therein."  <u>Maryland Cas. Co. v. Willsey</u>, 380 P.2d 254, 258 (Okla.1963); <u>see also</u> <u>Idg, Inc. v. Cont'l Cas. Co.</u>, 275 F.3d 916, 920 (10th Cir. 2001) (under Oklahoma law, "an insurer has a duty to defend an insured whenever it ascertains the presence of facts that give rise to the potential of liability under the policy").  In order to determine whether this potential of liability exists, the insurer must look to "'information gleaned from the petition (and other pleadings), from the insured and from other sources available to the insurer at the time the defense is demanded.'" <u>Id.</u> at 920 (quoting 7C Appleman, Insurance Law & Practice § 4683.01 at 303-04 (Berdal ed. 1979)).  By their terms, the Policies clearly limit the duty to defend to suits for "covered damages."  Therefore, the Insurance Companies had a duty to defend only if the potential of liability for covered damages existed.

It is clear from the face of the amended petition that the Williamses did not assert any claims that would have been covered under the Insurance Policies.  As discussed in Part III.A., <u>supra</u>, none of the Underlying Claims gave rise to liability under the Policies, because the Williamses' claims were not covered.  Thus, the Insurance Companies could properly conclude that no potential for liability existed.  The Boggses' suggestion that the Insurance Companies acted improperly because

22

they "did no investigation of the actual facts," Dkt. # 40 at 2, is incorrect.[16]  No additional facts could

have transformed the Williamses' claims into covered claims.

The Boggses argue that the rule of <u>Conner v. TransAmerica Insurance. Co.</u>, 496 P.2d 770

(Okla. 1972), imposes a duty to defend in this case.[17]   However, <u>Conner</u> does not apply here.   In

<u>Conner</u>, the insurance policy at issue was a lawyer's professional liability policy that covered "all

sums which the insured shall become legally obligated to pay as damages because of any act or

omission of the insured . . . arising out of the performance of professional services for others in the

insured's capacity as a lawyer." <u>Id.</u> at 773.  The policy further promised to "defend any suit against

the insured Alleging such act or omission and seeking damages which are payable under the terms

of this policy, Even if any of the allegations of the suit are groundless, false, or fraudulent . . . ." <u>Id.</u>

The policy also contained an exclusion for "any dishonest, fraudulent, criminal or malicious act of

the omission of any insured" <u>Id.</u>  The attorney in <u>Connor</u> was sued for misconduct that, if proved,

would have fallen under the exclusion, and the insurance company refused to provide a defense <u>Id.</u>

The Oklahoma Supreme Court determined that the exclusion for dishonest conduct did not apply to

---

16      Contrary to the Boggses' assertions, <u>First Bank of Turley v. Fidelity and Deposit Insurance</u>
        <u>Co. of Maryland</u>, 928 P.2d 298 (Okla. 1996), does not require either this Court or the
        Insurance Companies to make any greater investigation into the actual facts of the
        Williamses' suit.  In that case the insurer argued it had no duty to defend because the insured
        failed to adequately notify the insurer of the facts relative to coverage.  The insurer denied
        coverage without enough facts to determine whether coverage existed. <u>Id.</u> at 304.  The court
        stated that the insurer had "the duty to look behind the third party's <u>allegations to analyze</u>
        <u>whether coverage is possible.</u>"  <u>Id.</u> at 304 n. 15 (emphasis added).   If the claims are
        indisputably outside the scope of coverage, no additional investigation is necessary.

17      The Boggses also cite <u>St. Paul Fire & Marine Insurance Co. v. Pioneer Area Vocational-</u>
        <u>Technical School, Vo-Tech District No. 13</u>, 852 P.2d 795 (Okla. Ct. App. 1993), in support
        of their claim of a duty to defend. That case is inapposite because the issue in that case was
        whether the insurer had a duty to defend against declaratory judgment actions in addition to
        claims for monetary damages.

the duty to defend, but only to the duty to indemnify because "[i]t is certainly not consonant with the objects to be accomplished by a professional insurance policy to say that by its terms no protection is afforded the insured when groundless charges of fraud and dishonesty are alleged in a suit against him." Id. at 775.

The court in Conner explicitly distinguished Briscoe, in which the Oklahoma Supreme Court found that the insurance company had no duty to defend a contractor against a nuisance suit because the damages alleged were not "caused by accident" and therefore were not within the insurance policy's coverage. Conner, 496 P.2d at 775. The difference between Conner and Briscoe was that in Briscoe there was no duty to defend because the obligation to defend was limited, expressly, to any suit for damages "caused by accident," 239 P.2d at 755, while in Conner "the exclusionary clause in the policy . . . does not expressly preclude an obligation to defend suits in which it is Alleged that the insured's conduct is dishonest, fraudulent, criminal or malicious but grants relief from liability only where the insured's conduct is in fact dishonest, fraudulent, criminal or malicious." 496 P.2d at 775. Thus, in Conner the duty to defend existed because the subject of the suit was within the scope of the policy's coverage because it related to the insured's business activities, whereas in Briscoe no such duty to defend existed because the subject matter of the suit was outside the scope of the Policies.

Briscoe, and not Conner, controls in this case because the nature of the Underlying Claims removes them from the scope of the Policies' coverage.[18] The Underlying Claims are not within the scope of the Insurance Policies' coverage because they are not claims for property damage caused

---

[18]   In United States v. United States Fidelity and Guaranty Co., 601 F.2d 1136 (10th Cir. 1979), the Tenth Circuit found the Conner rule, rather than the Briscoe rule, applicable to a claim under a comprehensive general liability policy. That case is inapplicable here for the same reasons that Conner is inapplicable.

by an occurrence, just as the claims in <u>Briscoe</u> were outside the scope of coverage because they were not "for damages caused by accident." The <u>Conner</u> rule does not apply to the fraud claims here because, unlike those in <u>Conner</u>, they concern an incident outside the scope of the Policies.

Similarly, <u>Conner</u>'s language regarding policy exclusions and the duty to defend does not create a duty to defend against the negligence claims that are excluded from coverage on the basis of an "exclusion" in the policy. Unlike in <u>Conner</u>, in this case the Insurance Companies' duty does not depend on whether the underlying fraud allegations turned out to be true. Therefore, unlike in <u>Conner</u>, application of the exclusion in this case would not render the Policies' coverage meaningless.

The Boggses seize on the promise to defend "even groundless" claims and attempt to turn this into a promise to defend any conceivable groundless suit brought against them. However, the Policies clearly limit the Insurance Companies' obligations to defend to "any suit seeking <u>covered damages</u>." Dkt. # 18, Ex. 3, at 27; Dkt. 26, Ex. 22, at 27 (emphasis added). Because the Underlying Claims did not seek <u>covered</u> damages because they are outside the scope of the Policies' coverage, the Insurance Companies did not breach their contracts by refusing to provide indemnity or defense. Therefore, the Insurance Companies are entitled to summary judgment on the Boggses' claim of breach of contract.

**E.      Bad Faith**

The Insurance Companies also request summary judgment on the Boggses' allegations of violations of the duty of good faith and fair dealing. The Boggses did not request summary judgment on this issue, and have made no response to the Insurance Companies' motion on this subject.

Under Oklahoma law, "the essence of the intentional tort of bad faith with regard to the insurance industry is the insurer's unreasonable, bad-faith conduct, including the unjustified

withholding of payment due under a policy." <u>McCorkle v. Great Atlantic Ins. Co.</u>, 637 P.2d 583, 587 (Okla. 1981); <u>see also</u> <u>Christian v. Am. Home Assurance Co.</u>, 577 P.2d 899, 905 (Okla. 1977).  An insurer does not act in bad faith "when the insurer's denial of a claim is based on a legitimate dispute between the insurer and the insured."  <u>Claborn v. Wash. Nat'l Ins. Co.</u>, 910 P.2d 1046, 1050 (Okla. 1996).  In this case, the Insurance Companies' refusal to indemnify or defend the Boggses was based on a "legitimate dispute" over coverage, and therefore was not in bad faith.  Further, since the Underlying Claims were not covered, any withholding of payment can not be unjustified.  Accordingly, the Insurance Companies are entitled to summary judgment on the Boggses' claims of breach of the duty of good faith and fair dealing.

**IT IS THEREFORE ORDERED** that Defendants Great Northern Insurance Company and Federal Insurance Company's Motion for Summary Judgment Regarding Insurance Coverage (Dkt. # 18) is **granted**; Plaintiffs' Motion for Partial Summary Judgment (Dkt. # 25) is **denied**.  A separate judgment is entered herewith.

**IT IS THEREFORE ORDERED** that the September 21, 2009 jury trial is **stricken**.

**DATED** this 11th day of September, 2009.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT